IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RANDALL DEAN BUSSE,

                Plaintiff,                OPINION AND ORDER

v.

                                        21-cv-186-wmc

KILOLO KIJAKAZI, Acting Commissioner
for Social Security,

                Defendant.

---

      Pursuant to 42 U.S.C. § 405(g), plaintiff Randall Dean Busse seeks judicial review of the Social Security Commissioner's final determination upholding a finding that he was not disabled. On appeal to this court, plaintiff maintains that Administrative Law Judge ("ALJ") Deborah M. Giesen erred by (1) failing to properly consider the opinion of Busse's treatment provider, Peter P. Gintner, P.A.; (2) assessing Busse's credibility; and (3) failing to ensure that the Vocational Expert ("VE") provided a sufficient foundation and rationale for job number estimates. In addition, plaintiff also raises a familiar, repeatedly rejected constitutional challenge. For the reasons that follow, the court will affirm the Commissioner's decision.

BACKGROUND[1]

**A. Overview**

      Plaintiff Randall Dean Busse has at least a high school education, is able to communicate in English, and has past work experience as a lumber tallier, a level 3 semi-

---

[1] The following facts are drawn from the administrative record, which can be found at dkt. #11.

skilled job that required medium exertion. Busse has not engaged in substantial gainful activity since March 1, 2016, the same date as his amended alleged onset disability date. Busse applied for social security disability benefits on March 1, 2017. He has a date last insured of December 31, 2022.

With a birth date of August 23, 1965, Busse was 50 years old on the alleged amended disability onset date, defining him as closely approaching advanced age. 20 C.F.R. § 404.1563. Busse claimed disability based on back injury and neuropathy. (AR 135.)

### B. ALJ Decision

ALJ Giesen held a telephonic hearing on July 2, 2020, at which Busse appeared personally and by his counsel, the same counsel representing him in this appeal. On July 16, 2020, the ALJ issued an opinion finding that Busse had not been under a disability within the meaning of the Social Security Act from his alleged disability onset date through the date of the decision.

The ALJ first determined that Busse had the following severe impairments: "degenerative disc disease of the lumbar spine status-post laminectomy and discectomy, right lateral epicondylitis, obesity, and peripheral neuropathy." (AR 16.) The ALJ also considered whether other physical health conditions, namely injuries to his hands, including carpal tunnel syndrome, constituted severe impairments, concluding that they did not, findings plaintiff does not challenge on appeal. (AR 16-17.) Next, the ALJ considered whether Busse's impairments or combination of impairments met or medically

equaled various Listings, relating to his back pain, concluding that they did not. (AR 17.) Here, too, Busse does not challenge the ALJ's conclusions.

At step four, the ALJ further found that even with his impairments, Busse had the residual functional capacity ("RFC") to perform light, with the following additional exertional restrictions: "can occasionally balance, stoop, and climb ramps and stairs"; "can never kneel, crouch, crawl, or climb ladders, ropes or scaffolds"; "can have no work around unprotected heights, open flames, or unprotected dangerous machinery"; and "can frequently handle and finger with the bilateral upper extremities." (AR 17.)

After setting forth the standard under SSR 16-3p, the ALJ described plaintiff's testimony about the extent of his health issues, noting Busse's testimony that since his hearing in March 2019, his back condition remains the same, but his neuropathy is worse.[2] With respect to his neuropathy, Busse testified that "during the day, he has a burning pain on the top of his feet as if they were sun burned and the bottom of his feet feel as if he had been walking on hot payments." (AR 18.) He also testified that the pain at night disrupts his sleep, and that the more he is on his feet, the "hotter" his feet get. (*Id.*) Specifically, he reported that he is unable to stand for six hours out of an eight-hour day and that he is limited to walking to one-tenth of a mile at a time. With respect to his back, he reported that he still has pain and that his prior back surgery "only weakened the integrity of his back." (*Id.*) He reported that he can only lift ten pounds and that his ability to stoop, bend or kneel are all impacted by his back pain. Busse further testified that his pain

---

[2] After the first hearing and decision, the Appeals Council remanded his case for a second hearing and new decision. This appeal concerns the ALJ's second decision, issued in July 2020.

impacts his ability to concentrate. To treat his symptoms, Busse takes Ibuprofen, Hydrocodone, Lyrica and Gabapentin.

With respect to daily activities, Busse testified that he only drives short distances because his arms grow numb. He also testified that he is a village official, earning $1200 per year in that capacity, and that he owns five rental properties, all within eight miles of his home. He reported that his sons perform any maintenance associated with these properties, but that he and his wife organize the process for the work to be completed.

The ALJ then reviewed Busse's medical records, noting that Busse had back surgery in December 2013, which initially resolved his symptoms. Busse was able to return to work in the Fall of 2014, but that he injured his back when he fell on ice in December 2014, exacerbating his symptoms. Imaging from December 2014 showed mild degenerative changes of the lumbar spine, and an MRI from January 2015 showed recurrent right L4-L5 paracentral disc herniation impinging at the right L5 nerve root. Nonetheless, a physical therapist approved his return to light duty work in January 2015.

The ALJ then noted various medical records describing Busse's gait as "normal on several occasions," "negative straight leg raise tests," "full strength in the upper and lower extremities," and that he could "walk on his heels and toes." (AR 19.) Nonetheless, the ALJ also considered more recent records showing that Busse tested positive on the straight leg raise tests and that his treatment provider Peter Gintner, P.A., noted that his overall muscle strength was "probably 50 to 60 percent of normal." (*Id.*) The ALJ also recounted that since surgery, Busse's treatment has been conservative in nature, relying on intermittent use of pain and nerve medications, but declining additional physical therapy

4

or facet injections. Based on this, the ALJ concluded that Busse could perform light work, with the additional restrictions noted in the above RFC.

Material to this appeal, the ALJ also considered Busse's peripheral neuropathy, explaining that a "July 2017 electroneuromyogram (EMG) report concluded a normal study with no electrodiagnostic evidence for large fiber peripheral polyneuropathy (Exhibit 4F/4)." (AR 20.) The ALJ further noted that in an April 2018 examination, Busse was not in apparent distress and his coordination was normal and his gait was steady, although he had "decreased pinpick distally in the lower extremities." (*Id.*) Busse's neurologist, Dr. Farache, similarly noted the prior EMG study and suggested a skin biopsy to rule out the possibility of *small* fiber neuropathy. Finally, an "October 2018 [] left calf biopsy indicated normal epidermal nerve fiber density and a left foot biopsy indicated low normal epidermal nerve fiber density. (Exhibits 23F/13; 25F/10; 23)." Based on this, the ALJ concluded, "[t]he records of that biopsy do not reference a diagnosis for small fiber neuropathy." (*Id.*)

The ALJ then reviewed a note from an RN, dated October 26, 2018, in which Busse stated that he was "informed [that] Dr. Ray reviewed his nerve biopsy which showed borderline small fiber neuropathy in his left foot," and that Dr. Ray recommended he "continue Lyrica and schedule follow up with Dr. Farache." (*Id.* (citing Exhibit 25F/14).) The ALJ notes that there are no records from a Dr. Ray, and further observes that the biopsy and related documents reference other doctors. Nonetheless, the ALJ concludes, "[d]espite what appears to be contrary evidence, and a complete lack of any records from a Dr. Ray, I have included neuropathy as a severe medically determinable impairment.

5

However, as discussed herein, the findings on examination and his activities show he can do light exertional work." (*Id.*)

Material to another challenge raised by plaintiff, the ALJ also reviewed the records of Peter Gintner, P.A., covering July 2019 through May 2020, detailing burning and tingling pain in the lower extremities. Specifically, examinations revealed that Busse's extremities were cool to the touch, strength ranged from fair to "50 to 60 percent of normal," and that there was decreased sensation. (AR 20-21.) Nonetheless, Busse reported that the combination of medications kept his pain fairly controlled. In a May 1, 2020, record, Gintner similarly noted that his "idiopathic peripheral neuropathy remained stable" on medication. (AR 21.) In light of these records, the ALJ concluded that Busse could "occasionally balance and climb ramps and stairs" but could "never climb ladders, ropes or scaffolds," and also barred him from working "around unprotected heights, open flames, or unprotected dangerous machinery." (*Id.*)

The ALJ then reviewed the medical opinions, assigning significant weight to the state agency medical consultants who opined that plaintiff could perform light exertion work, specifically noting their consideration of his spinal degenerative disease, including (1) evidence of pain and limited motion and (2) records that he occasionally presented with an antalgic gait. (AR 21.) The ALJ also considered the opinions of Adam M. Tuttle, M.D., who limited him to medium exertional capacity, but concluded that his opinions were entitled to only "some weight," because his restrictions were intended to be temporary restrictions and did not account for evidence in the record that would warrant greater restrictions. (*Id.*)

As for P.A. Gintner, the ALJ afforded his opinions "very little weight," because they are not based on "any objective evidence," but instead are "apparently based on the claimant's complaints of bilateral foot paresthesia[]." (AR 22.) Specifically, the ALJ noted that "the EMG testing of the lower extremities was normal with no evidence of neuropathy." (*Id.*) The ALJ also found that the physician assistant's notes were inconsistent, at one point opining that Busse could not return to work, but another time limiting him to sedentary work. The ALJ also rejected P. A. Gintner's opinion because for certain restrictions (namely, no lifting, the need to elevate his feet and the need to use a cane), there was no support in the record. The ALJ also questioned Gintner's conclusion that Busse would have trouble concentrating in light of his participation in village politics and his official duties. The ALJ also noted that as a physician assistant: (1) Gintner is "not an acceptable medical source by [SSA] standards"; (2) his opinions were "vague"; and (3) he failed to explain "whether these limitations were to last more than one year." (*Id.*)

After reviewing other medical opinions and various third-party statements that are not material to plaintiff's appeal, the ALJ next considered plaintiff's daily activities, noting that notwithstanding plaintiff's testimony about his limited activities, the record showed that he engaged in shoveling, grocery shopping, attending to village politics and business, and overseeing the management of five rental properties. The ALJ further noted his neurosurgeon's work restrictions in 2016 only limited him to medium exertion work, including allowing him to lift up to 50 pounds. The ALJ further relied on physical therapy and other records showing that when he was compliant with therapy and injections, his pain was relatively well controlled. Finally, the ALJ noted that Busse's "symptoms were

7

not so severe to motivate him to seek the treatment or evaluation offered by a specialist other than using narcotics for pain relief." (AR 24.)

With the assistance of a VE, therefore, the ALJ concluded that Busse could not preform his past relevant work as a lumber tallier, but that there were jobs in significant numbers in the national economy that he could perform, including: a marker (D.O.T. code 209.587-034) with 200,000 jobs nationally; routing clerk (D.O.T. code 222-687-022) with 40,000 jobs nationally; and cafeteria attendant (D.O.T. code 311-.677-010) with 100,000 jobs nationally. As such, the ALJ concluded that Busse was not under a disability, and this appeal followed.

OPINION

The standard by which federals court review a final decision by the Commissioner of Social Security is now well-settled: findings of fact are "conclusive," so long as they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Moreover, provided the Commissioner's findings under § 405(g) are supported by this kind of "substantial evidence," this court cannot reconsider facts, re-weigh the evidence, decide questions of credibility, or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Finally, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, courts must conduct a "critical review of the

8

evidence," *id.*, ensuring that the ALJ has provided "a logical bridge" between findings of fact and conclusions of law. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Plaintiff raises three core challenges on appeal, which the court takes up in turn.[3]

I. **Weighing P.A. Gintner's Opinions**

Plaintiff first argues that the ALJ erred in assessing the weight to give plaintiff's treatment provider, Peter Gintner, P.A. If the ALJ had credited his testimony and concluded that Busse was limited to sedentary work, plaintiff contends that given his age (50 at onset) and the fact that he has no past relevant work at the sedentary level with no transferrable skills, he would have been deemed disabled. (Pl.'s Opening Br. (dkt. #16) 14.) Specifically, plaintiff relies on Gintner's opinion that Busse could not stand for six hours as required for light work given his neuropathy.

As detailed above, however, the ALJ provided several, substantial reasons for placing very little weigh on Gintner's opinions, which Busse attempts to challenge for various reasons. *First*, while Busse recognizes that the ALJ correctly stated that Gintner, a physician assistant, is not an "acceptable medical source," he nonetheless argues that the ALJ should have evaluated his opinions as an "other source" under SSR 06-3p. (Pl.'s Opening Br. (dkt. #16) 16.) If the ALJ had simply discounted Gintner's opinion on that basis, then Busse's argument may have some traction, but the record reflects that this was only part of her lengthy explanation for largely rejecting Gintner's opinion. In particular,

---

[3] Plaintiff also raises a constitutional challenge to the Commissioner's authority to continue in that capacity, and therefore the legality of the rejection of his disability claim, which the court rejects for the reasons provided in *Schwechel v. Kijakazi*, No. 20-CV-700-WMC, 2022 WL 135022, at *5 (W.D. Wis. Jan. 14, 2022).

the ALJ considered Gintner's opinion in light of the other evidence in the record, including other medical evidence, noting inconsistencies between that evidence and Gintner's various opinions. *See* SSR 06-3p (describing factors to consider in assessing opinions from other sources).

*Second*, Busse criticizes the ALJ's consideration of the medical record to discount Gintner's assessment of the impact of neuropathy on his ability to work. However, as detailed above, the ALJ actually reviewed contrary evidence, including the results of the 2018 MRI, which showed no evidence of neuropathy. The ALJ further noted an EMG did not rule out small fiber neuropathy, which a biopsy was ordered to confirm or rule out that diagnosis. Plaintiff also maintains that the "January 31, 2019, biopsy indicated that Busse had small fiber neuropathy," citing two records for support. (Pl.'s Opening Br. (dkt. #16) 21 (citing AR 1377, 1497).) The first record is a note from P.A. Gintner, dated February 1, 2019, in which he reports, "[p]atient is here to reevaluate his neuropathy and indicates he had biopsies done which reveal small fiber neuropathy." (AR 1377.) The second is a "telephone note," dated October 26, 2018, which predates any January 2019 biopsy, and states: "A message was left for patient to call me back. Patient to be informed Dr. Ray reviewed his nerve biopsy which showed borderline small fiber neuropathy in his left foot. Patient to be told Dr. Ray recommends he continue Lyrica and schedule a followup with Dr. Farache." (AR 1497.)

Still, neither of these records support a finding of small fiber neuropathy in light of the actual biopsy results. Instead, as the ALJ explained, the pathology report from a October 9, 2018, biopsy shows that his left calf skin was "normal Epidermal Nerve Fiber

Density," and his left foot skin was "low normal Epidermal Nerve Fiber Density," but the report did *not* diagnose small fiber neuropathy, nor did any other record. As such, the court finds no error in the ALJ's discussion of the lack of objective medical evidence to support plaintiff's neuropathy diagnosis.

*Third*, the ALJ noted medical records describing normal coordination and gait, concluding that contradicted the extreme limitations described by Gintner. While plaintiff contends that the ALJ "cherry-picked" from the medical record, ignoring records from 2013 and 2015 describing his gait as antalgic and noting positive straight leg raises (Pl.'s Opening Br. (dkt. #16) 22), the ALJ actually noted that his "gait was described as normal on several occasions," and that he had "several negative straight leg raise tests." Moreover, the ALJ also noted that Busse occasionally presented with antalgic gait and that some straight leg raise tests were positive required additional exertional restrictions in his RFC. (AR 19, 21.) Regardless, given that Gintner's opinion primarily concerned Busse's peripheral neuropathy, plaintiff has failed to explain how records primarily concerning his back pain and degenerative disc disease would render the ALJ's treatment of Gintner's opinion inadequate.

*Fourth*, while the ALJ found Gintner's opinion to be consistent with that of another treating physician, Johnathon D. Justice, M.D., the ALJ also discounted Dr. Justice's opinion, who evaluated Busse for an earlier worker's compensation claim. The ALJ did so on the basis that: medical records described Busse's gait as normal on several occasions; he had several negative straight leg raise tests; and his physical examinations were normal. Plaintiff does not challenge the ALJ's treatment of Justice's opinion, but as this court has

11

previously explained, "two flawed opinions do not equal a good one." *Cassens v. Saul*, No. 19-912, 2020 WL 3316094, at *3 (W.D. Wis. June 18, 2020). As such, the fact that Gintner's opinion may be consistent in part with that of Dr. Justice does not by itself call into question the ALJ's own, detailed treatment of Gintner's opinion, especially in light of the deferential review of that treatment. Having reviewed the ALJ's decision, Gintner's opinion and key medical records, therefore, the court finds no error in the ALJ's explanation of her reasons for discounting Gintner's opinions.

## II. Assessing Busse's Credibility

Busse next challenges the ALJ's treatment of his own credibility, and specifically, her rejection of his statements about the extent of his limitations. This argument largely regurgitates his arguments about the ALJ's treatment of the medical records concerning the left calf and foot biopsy. For the reasons explained above, however, the court concludes that the ALJ had a firm basis for finding that there were no medical records diagnosing small fiber neuropathy. Regardless, the ALJ *did* include peripheral neuropathy on Busse's list of severe impairments, *and* she considered the limitations posed by this impairment in crafting Busse's RFC. The court sees no error in the ALJ's treatment of these records. At minimum, she explained in detail her conclusion that the objective medical evidence did not support further restrictions. Moreover, the ALJ provided sound reasons for discounting Busse's credibility more generally, including among other reasons: his reliance on conservative treatment; his declining additional physical therapy and injections; his ability to manage a village official duties; and his maintenance of five rental properties.

### III. Ensuring Reliability of VE's Job Numbers

Finally, Busse challenges the reliability of the VE's testimony about job numbers. "In the context of job-number estimates," the Seventh Circuit has previously explained that "the substantial evidence standard requires the ALJ to ensure that the approximation [of the availability of jobs] is the product of a reliable method." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018) (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). Thus, "[a] finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008).

Even so, the Seventh Circuit has recognized that a VE's job estimate number is necessarily an approximation and that there is "no way to avoid uncertainty" in arriving at such a figure. *Chavez*, 895 F.3d at 968. As a result, a VE's testimony as to job availability need not meet an "overly exacting standard." *Id.* Still, in *Brace v. Saul*, 970 F.3d 818 (7th Cir. 2020), the court reemphasized that a VE's "[t]estimony that incants unelaborated words and phrases such as 'weighting' and 'allocation' and 'my information that I have' cannot possible satisfy the substantial-evidence standard." *Id.* at 822.

During the hearing in this case, the VE was asked specifically about his methodology in arriving at the job numbers he provided, and the ALJ relied on in her opinion. In response, the VE testified:

> My job numbers are estimates that I would derive from figures from the U.S. Bureau of Labor Statistics. The Bureau often will report job numbers in a group of several distinct DOT titles comprising a group. My method would be to look at the composition of the group and based on knowledge of the labor market, I would place weight on the different occurrences of

13

> the job within the economy and come up with an estimate of jobs reflecting the job I selected.

(AR 68.) Moreover, when counsel for plaintiff then asked for a more specific explanation of how the VE arrived at 200,000 jobs for the marker position, representing that the 2018 DOL statistics showed 2,046,040 jobs in the broader Standard Occupational Classification ("SOC") code, the VE further explained:

> Well, I explained the source that I use as the marker within SOC for stock and order color code 53-7065. That SOC has 38[] DOT occupations. I looked at the composition of that group of 38 jobs and I would weigh different jobs. It also says that there are 2,135,850 estimated jobs in that group. So, I estimated 200,000 for the marker position. . . . Some of the jobs are in very selective and narrow occupation areas and they would have less employment. The marker is found in the type of retail warehousing types of facilities. So, based on knowledge of the market, I decided that the marker would have a higher share of those numbers an[d] estimated 200,000 for the job.

(AR 69.)

Here, the VE referenced commonly-used government resources in determining job numbers at the SOC level, then with an understanding of the DOT occupations with the SOC code, explained that he then considered the employment characteristics of the specific job at issue, drawing upon his knowledge of the labor market to come up with a more precise, narrow number. As it did in *Sok v. Kijakazi*, No. 3:20-cv-489, 2021 WL 4350566 (W.D. Wis. Sept. 24, 2021), the court sees no error in the VE's approach or the ALJ's reliance on it. *Id.* at *4 (rejecting similar argument where the VE relied on "sources commonly used in social security matters" and the "'equal distribution method' as a basis or starting point," but then "further drew on his many years of experience and generally strong credentials to support his estimates"); *see also Bauernfeind v. Kijakazi*, No. 3:20-cv-

14

495 (W.D. Wis. Sept. 20, 2021) (available at dkt. #18-1) (rejecting challenge to VE's job number estimates where the VE "did not blindly accept the Bureau of Labor's numbers or rely on the faulty 'equal distribution' method criticized in Chavez and other cases, not did he offer unintelligible jargon like that given by the vocational expert in Brace"). As such, the court rejects this challenge as well.

ORDER

IT IS ORDERED that the decision of defendant Kilolo Kijakazi, Acting Commissioner of Social Security, denying plaintiff Randall Dean Busse's application for social security disability benefits is AFFIRMED. The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 4th day of March, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge